UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TNT LOGISTICS NORTH AMERICA, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 05 C 7219 |
| | ) |
| BAILLY RIDGE TNT, LLC, | ) |
| LOCATION FINDERS INTERNATIONAL, INC., | ) |
| and MICHAEL H. ROSE, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff TNT Logistics North America, Inc. ("TNT") and Defendant Bailly Ridge TNT, LLC ("Bailly") are parties to a lease negotiated on behalf of the lessor, Bailly, by Defendants Location Finders International and Michael H. Rose.[1] The parties understood that TNT, the lessee, would operate a warehouse on the leased property on a 24/7 schedule. In its First Amended Complaint (the "Complaint"), TNT alleges that Bailly has breached a provision of the lease that required it to construct an earthen berm and solid fence necessary for noise abatement, and has failed to indemnify TNT against claims asserted by neighboring landowners who have filed complaints with the Illinois Pollution Control Board (the "Board") and who seek restrictions on TNT's operations due to the noise. Defendants now move to dismiss the Complaint. They argue that TNT's "conclusory statements about what might occur in actions brought by neighboring homeowners" before the Board do not state an actual case or controversy within Article III of the Constitution. They contend,

---

[1] The court's jurisdiction is secure under 28 U.S.C. § 1332. Plaintiff TNT is a Delaware corporation whose principal place of business is in Florida. Defendant Location Finders International ("LFI") is an Illinois corporation whose principal place of business is in Mokena, Illinois. Defendant Bailly is an Illinois limited liability company whose three members (Marty Burke, Carl Quanstrom, and Defendant Michael Rose, who is president of LFI) are all Illinois citizens and residents. (Am. Compl. ¶¶ 1-9.) TNT also properly alleges an amount in controversy of more than $75,000, based either on the potential costs for which TNT seeks indemnification, or the cost-of-completion expense for its breach of contract claim. (*Id.* ¶¶ 40, 48.) *See Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 539 (7th Cir. 2006) (holding that potential outlay for an indemnity claim counts toward the amount in controversy requirement).

further, that Plaintiff's allegations are defeated by the language of the written lease agreement and that LFI, which is not a party to the contract, is not properly sued for its breach. For the reasons set forth below, the motion is granted in part and denied in part.

**FACTS**

For purposes of this motion, the court presumes the truth of all of TNT's well-pleaded allegations. *See Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1429 (7th Cir. 1996). The parties' dispute revolves around the meaning of relevant provisions of the lease agreement; those provisions are incorporated by reference into the Complaint and are properly before the court pursuant to FED. R. CIV. P. 10 (c).

Plaintiff TNT is in the business of providing warehouse and distribution services. (Am. Compl. ¶ 10.) On March 1, 2004, TNT entered into a lease agreement (the "Lease") with Bailly for land and property located in the Bailly Ridge Corporate Center in Monee, Illinois. (*Id.* ¶ 16.)

Defendant LFI, through its president Michael Rose, negotiated the Lease on behalf of Bailly. (*Id.* ¶ 15.) Paragraph 4 of the Lease imposes certain obligations on Bailly: pursuant to paragraph 4(b)(iii), Bailly "represent[ed] and warrant[ed]" that warehouse operations "on a 24-hour a day, 7-day a week basis, shall be permitted under all applicable land use and zoning laws, codes, regulations and ordinances and applicable covenants and restrictions of record during the Lease Term." (*Id.* ¶ 17, quoting Lease Paragraph 4(b), Ex. A to Complaint.) Paragraph 4(b) also requires Bailly to indemnify TNT against certain claims that might arise:

> [Bailly] shall indemnify and hold [TNT] harmless from and against, and shall reimburse Tenant for, all liabilities[,] obligations, suits, causes of action, administrative actions, losses, damages, fines, penalties, claims, demands, costs, charges, judgments and expenses , including reasonable attorneys' fees and costs (collectively, "Claims"), arising from or in connection with any breach of these representations and warranties.
>
> This indemnification obligation shall include, without limitation, all Claims arising from any challenges seeking to eliminate or reduce the scope of [TNT]'s intended use of the Premises. This indemnification obligation shall not include any claims arising from [TNT]'s failure to operate its facility in conformity with local zoning laws

2

and codes, provided that such local zoning laws and codes permit the operation of
the Premises as represented and warranted in item (iii) above.

(*Id.* ¶¶ 17-19, quoting Lease Paragraph 4(b).)

The parties were aware, months before the execution of the Lease, of the possibility that warehouse operations would generate noise. Consultants from the firm of Shiner and Associates studied the property and issued a report that recommended the construction of an earthen berm and a wooden fence for the purposes of noise reduction. (*Id.* ¶¶ 27-28, 31.) In an unsigned document on Defendant LFI's letterhead, dated October 17, 2003 and titled "Sound Attenuation Proposal", an unidentified person (identified only as "I") committed to building the berm and fence and explained that to account for the cost of this construction, the rent for the leased property would be increased by "$.10 per square foot per year." (*Id.* ¶¶ 29-33; Sound Attenuation Proposal, Ex. B to Complaint.) Together with the Lease, Bailly and TNT executed a "Construction Addendum" which required Bailly to provide "an earthen berm topped by a solid fence," subject to TNT's approval, and "[in] compliance with the conclusions of the Shiner and Associates report of October 17, 2003." (Am. Compl. ¶ 22, citing Construction Addendum (14)(A)(3), Ex. A to Complaint.) Defendant Michael Rose, a member of Bailly and President of LFI, executed a guaranty of Bailly's obligations on the Lease. (*Id.* ¶¶ 22-26.)

TNT took possession of the property in December 2004 and began warehouse operations there the same month. (*Id.* ¶¶ 33, 34.) The following June, persons who live near the property filed six complaints against TNT with the Board, alleging that the noise being emitted from the premises violated Illinois law and asking the Board to order TNT to relocate or change its hours of operation. (*Id.* ¶¶ 35-37.) TNT alleges that it "will incur more than $75,000 in attorney fees to defend itself" and that an order requiring it to relocate would cost more than $75,000. (*Id.* ¶40.) On July 1, 2005, TNT wrote to Defendants TNT and Michael Rose, advising them of the complaints and notifying them that "TNT considered [Baillly and Rose] to have obligations under the Lease to indemnify, hold

3

TNT harmless, and reimburse TNT with regard to" the citizen complaints. (*Id.* ¶ 42.) Counsel for Bailly and Rose responded on July 7, denying indemnification "at this time" and characterizing the neighbors' complaints as based on TNT's exceeding the noise levels permitted under zoning codes. (*Id.* ¶ 44; Letter from Lewison to Dawson of 7/7/05, Ex. J to Complaint.)

TNT alleges that the fence constructed by "[Bailly] or its affiliate" is not a solid fence and does not comply with the conclusions of the Shiner and Associates report. (*Id.* ¶¶ 46-49.) Plaintiff alleges, further, that the inadequacies in the fence "caused or contributed to cause" the citizen complaints against TNT. (*Id.* ¶ 50.)

## DISCUSSION

In the Complaint, Plaintiff TNT charges Bailly, Rose, and LFI with breach of contract (Counts I, II, and III). In addition, as alternatives to its breach of contract claim against LFI, Plaintiff charges LFI with common law negligence (Count IV) and seeks recovery under a promissory estoppel theory (Count V). In their motion to dismiss, Defendants argue that until the Board determines that TNT's operations at the property violate the law, Plaintiff's indemnity claim is not ripe for adjudication. (Defendants' Memorandum in Support of Their Motion to Dismiss Plaintiff's First Amended Complaint (hereinafter "Defs. Mem."), at 8.) In any event, Defendants contend, Plaintiff's claim for indemnification is defeated by the language of the Lease agreement. (*Id.* at 9-10.) Because Defendant LFI is not a party to the Lease, Defendants argue that LFI is not liable for breach of contract. (*Id.* at 12.) They contend that any negligence claim against LFI cannot be maintained under the "voluntary undertaking" doctrine and is barred by the *Moorman* doctrine. (*Id.* at 14-15.) Finally, Defendants challenge TNT's promissory estoppel claim on a variety of grounds, including their contention that LFI made no unambiguous promise on which TNT could reasonably have relied. (*Id.* at 13-14.) The court addresses these arguments in turn.

**I.    Standard of Review**

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court accepts all

4

well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Travel All Over the World, Inc.*, 73 F.3d at 1429. Dismissal is proper only where it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claims. *Id.* at 1429-30 (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## II.     Counts I and II: Breach of Contract Claims Against Bailly and Rose

In Count I, Plaintiff charges Defendant Bailly with breach of contract. Specifically, TNT alleges that Bailly (1) has failed to construct the berm and fence "in compliance with the conclusions of the Shiner and Associates report," and (2) has refused to indemnify Plaintiff for the Board complaints that resulted from the inadequacies in the berm and fence. (Am. Compl. ¶¶ 53, 56, 58.) In Count II, Plaintiff seeks to enforce against Defendant Rose his guaranty of proper construction of the berm and fence and of the duty to indemnify. (*Id.* ¶¶ 52-54.) Defendants' motion to dismiss does not address Plaintiff's allegations concerning the construction breach, but contends the allegations regarding Bailly's failure to indemnify are inadequate because the Lease agreement excludes this claim from the scope of the indemnification provision and because any claim under that provision is not ripe. (Defs. Mem., at 8-10.)

### A.     Exclusion of Indemnity for Zoning Violations

Defendants' challenge to the scope of the indemnification provision requires little discussion. In arguing that the provision does not cover noise pollution claims, Defendants observe that the indemnification clause specifically carves out any claim arising from TNT's failure to operate its facility in conformity with local zoning laws. Thus, they contend, to the extent that TNT is operating the warehouse in violation of noise pollution regulations, Bailly has no duty to indemnify TNT. (Defs. Mem., at 9-10.) On a motion to dismiss, however, the complaint must be read in the light most favorable to Plaintiff, *see Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003), and may be dismissed only if there is no set of facts consistent with the allegations that would state a claim for relief, *see Adams v. Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004). Defendants expressly

warranted that round-the-clock warehouse operations would be permissible under applicable local zoning regulations. (Am. Compl. § 17; Lease Paragraph 4(b)(iii), Ex. A to Complaint.) As the court understands the Complaint, Plaintiff has alleged that, to the extent the warehouse operations violate zoning laws, that is only because the berm and fence are inadequate to reduce noise from those operations. Defendants may not rely on their alleged breach of the berm and fence construction obligations to excuse their obligation to indemnify Plaintiff.

Defendants also note that the agreement gave TNT the right to approve the berm and that Plaintiff has not alleged that the berm was not approved. (Defs. Mem., at 4.) The court concludes the absence of such an allegation does not defeat the indemnification claim, particularly because nothing in the agreement suggests Plaintiff's approval of the construction negates the indemnification provision.

**B.    Ripeness**

Defendants' argument that the indemnification claim is not ripe[2] requires greater analysis. The Board has not ruled on the alleged noise pollution claims. Unless and until a judgment is entered against Plaintiff, Defendants contend, Plaintiff will have suffered no harm and there will be nothing for Defendants to indemnify. (Defs. Mem., at 8.)

In the insurance context, the general rule in Illinois[3] is that an insurer's duty to indemnify is not ripe until the insured has already incurred liability in the underlying claim against it. *See Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d 90, 127, 607 N.E.2d 1204, 1221 (1992); *see also Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 680 (7th Cir. 1992). As one Illinois court explained: "[T]he duty to indemnify arises when the insured becomes 'legally obligated'

---

[2]    Plaintiff correctly notes that there are no ripeness concerns regarding its breach of contract claim as to the berm and the fence. (Response to Defendants' Motion to Dismiss (hereinafter "Pl.'s Resp."), at 17.)

[3]    The parties do not dispute that Illinois law governs.

to pay damages in the underlying action that gives rise to a claim under the policy. One does not become legally obligated until a judgment or settlement is reached between the parties." *N. Illinois Gas Co. v. Home Ins. Co.*, 334 Ill. App. 3d 38, 43, 777 N.E.2d 417, 421 (1st Dist. 2002) (citations omitted). Plaintiff acknowledges the general rule, but contends that unlike an insurance policy that provides for indemnification only when damages are ascertained and judgment entered, the Lease requires Bailly to indemnify TNT in the event of any "claim" or "challenge" to TNT's use of the premises; thus, Bailly's duty to indemnify arose automatically upon the neighbors' filing of the complaints with the Board, and TNT's claim is ripe. (Pl.'s Resp., at 18-20.) This effort to sidestep Defendants' ripeness challenge is unpersuasive. The issue is not what kinds of claims are entitled to indemnification, but whether there is yet any loss against which Bailly must indemnify TNT. In the court's view, for purposes of Bailly's duty to indemnify, the Board complaints are no different from any other lawsuit. If and when TNT incurs liability on the Board complaints, a court can decide, if need be, the scope of Bailly's duty of indemnification under the Lease.[4]

Plaintiff also contends that Illinois courts observe an exception to the general rule that an insurer's duty to indemnify is only triggered upon judgment of an underlying claim. In *Bonnie Owen Realty, Inc. v. Cincinnati Ins. Co.*, 283 Ill. App. 3d 812, 818, 670 N.E.2d 1182, 1186-87 (5th Dist. 1996), the court noted a fact-specific exception to this rule for declaratory judgment actions brought to determine insurance coverage, where the issues involved in the declaratory judgment action are separable from those in the underlying action and thus avoid collateral estoppel problems. Plaintiff argues that this exception should apply here by analogy and allow the court to determine the scope of Bailly's duty of indemnification before TNT has incurred liability on the Board claims. (Pl.'s Resp. at 20.) The court declines to extend Illinois law so far, considering that this case involves neither

---

[4]i  Indeed, although Bailly has indicated that it would not indemnify TNT "at this time," (Letter from Lewison to Dawson of 7/7/05, Ex. J to Complaint), it is not at all certain that Bailly would refuse to do so in the future.

7

insurance coverage nor a declaratory judgment. Moreover, it is not at all clear that the issues involved in the indemnification claim are separate from those in the Board complaints; for instance, a determination for indemnification purposes that TNT's decibel level from its operations violated zoning ordinances could very well prejudice TNT in contesting the Board complaints.

Plaintiff further contends that regardless of the outcome of the Board complaints, Defendants have an immediate duty to reimburse TNT for its costs and attorneys fees incurred in defending those complaints, and Defendants' failure to do so thus far constitutes a ripe controversy. (Pl.'s Resp., at 10, 18.) Plaintiff cites several cases, all from jurisdictions outside Illinois, for the proposition that an agreement to "indemnify and hold harmless" imposes a duty to pay defense costs, whether successful or not. (*Id.* at 7-8.) Although many of these cases do embrace a broad understanding of the duty to indemnify, most of them do not contradict the general Illinois rule that whatever the scope of an indemnification obligation, it is not triggered until after the indemnified party has suffered a loss. *See Rogers & Babler, Div. of MAPCO ALASKA, Inc. v. State,* 713 P.2d 795, 800 (Alaska 1986) ("There exists no affirmative duty to defend under the language "indemnify and save harmless", but only a duty to reimburse for costs of defense, whether successful or not."); *Shannon v. Kaiser Aluminum and Chem. Corp.*, 749 F.2d 689, 690-91 (11th Cir. 1985) ("Under Florida law, the general rule is that an indemnitee under an indemnification agreement is entitled to recover reasonable attorney's fees and legal costs which he is compelled to pay as a result of suits brought against him relating to matters for which he is entitled to be indemnified. This rule is equally applicable whether the indemnitee is successful in his defense of the suit or not."); *Miller & Co. of Birmingham v. Louisville & N. R. Co.,* 328 F.2d 73, 78 (5th Cir.1964) ("The [indemnitor] has the option to take its chances and await the possible event of the liability of the railroad becoming fixed and ascertained. . . . [I]n the event of judgment against the railroad, the agreement to 'hold harmless' includes the costs of defending the claim."); *cf. Commercial Standard v. Cleveland*, 86 Ariz. 288, 345 P.2d 210 (1959) (an indemnity provision silent on the issue of defense costs imposed

a duty to defend, but the indemnitor discharged that duty by offering to provide a defense during the underlying litigation). *S. Arizona York Refrigeration Co. v. Bush Mfg. Co.*, 331 F.2d 1, 6 (9th Cir. 1964) held that "an indemnitee is entitled to recover against the indemnitor the costs and expenses incurred in defending the suit" where the indemnitor has notice of the claim against the indemnitee and refuses to defend. The court's opinion does not include the language of the indemnification clause, but a judgment had already been rendered against the indemnitee. *Kaydon Acquisition Corp. v. Custum Mfg. Inc.*, 317 F. Supp. 2d 896, 909-10 (N.D. Ia. 2004) focused on the question whether the indemnification clause at issue provided for reimbursement only where the indemnitee had a legal liability to the allegedly injured party; the underlying products liability action had already been settled, so the claim for indemnification was unquestionably ripe. Similarly, *Miller and Schlosser Steel, Inc. v. Thomas Lindstrom Co.*, No. 87-6154, 1988 WL 28250, at *1 (E.D. Pa. Mar. 3, 1988), holds that an indemnification clause similar to the one at issue here imposes no affirmative duty to defend, but simply imposes an obligation to reimburse the indemnitee for the cost of defense. The indemnity provision in *Chadwick BaRoss, Inc. v. Martin Marietta Corp.*, 483 A.2d 711, 717 (Me. 1984), unlike this one, specifically authorized recovery of attorneys' fees incurred by the indemnitee; but that provision was not enforced until after a judgment on the underlying tort claim had been affirmed. In *St. Paul Fire & Marine Ins. Co. v. Crosette Bros., Inc.*, 475 P.2d 69, 71 (Or. 1970), the court required the indemnitor to reimburse the indemnitee for defense costs despite the fact that the indemnification agreement did not impose such a duty, but the underlying tort claim had been settled when the indemnification action was filed.

Even if the indemnification agreement does not impose a duty to pay defense costs, Plaintiff argues that the Lease by its express terms imposes upon Bailly an immediate "duty to reimburse" TNT for attorneys' fees. (Pl's. Resp., at 10; Lease Paragraph 4(b) ("[Bailly] shall indemnify . . . and shall reimburse [TNT] for, all . . . costs . . . including reasonable attorneys' fees").) As the court reads Paragraph 4(b), however, the Lease does not create a duty to reimburse separate from the

9

duty to indemnify; rather, Paragraph 4(b) requires Bailly to reimburse certain associated expenses as part of its duty to indemnify. There is nothing in Paragraph 4(b) to suggest that reimbursement of expenses is required prior to and independent of indemnification. Indeed, the list of items for which Bailly is to reimburse TNT combines attorneys' fees with "judgments" and labels them all "collectively, Claims." As discussed above, TNT's indemnification claim is not ripe because there is nothing to indemnify until TNT incurs liability on the underlying claim. It follows that TNT's claim for reimbursement of expenses, as part and parcel of indemnification, is not ripe either.

Finally, Plaintiff asserts in the Complaint that the Lease requires Defendants to not only indemnify, but defend TNT as well. (Am. Compl. ¶ 52.) The inference, presumably, is that although the duty to indemnify may not yet be triggered, Defendants are required immediately to provide a defense to the Board claims. The only authority Defendants have cited in response to this assertion is an unreported decision in which Judge Marovich of this court held an indemnity provision in a construction contract unenforceable under the Illinois Structural Work Act. *Thompson v. Area Equip., Inc.*, No. 90 C 121, 1991 WL 47366 (N.D. Ill. Mar. 29, 1991). Defendant argued that a claim under a "duty to defend" theory should be dismissed on the same ground, but the court simply observed that the indemnity clause in the parties' agreement "does not impose on [defendant] a duty to defend [plaintiff]" and that the indemnity obligation, if valid, would be triggered only if plaintiff had "first suffer[ed] a loss." *Id.* at *3.

The language of the Lease requires Defendants to "indemnify," "hold harmless" and "reimburse" Plaintiff for all claims against it, but does not by its terms impose on Defendants a duty to defend. While the duty to defend is broader than the duty to indemnify in that it may be triggered upon the mere notice of a claim, rather than upon judgment, *see Keystone Consol. Indus., Inc. v. Employers Ins. Co. of Wausau*, 456 F.3d 758, 762 (7th Cir. 2006), Plaintiff cites no authority, and the court can locate none, that finds a duty to defend implied within a duty to indemnify, where the indemnification agreement is silent as to the duty to defend. *Cf. Cent. Ill. Light Co. v. Home Ins.*

10

*Co.*, 213 Ill. 2d 141, 158, 821 N.E.2d 206, 216 (2004) (noting that an insurer's duty to indemnify cannot be predicated on the duty to defend where the policy did not impose a duty to defend); *see also Keystone*, 456 F.3d at 762 (noting that the duties to defend and to indemnify are independent of one another).

In its response to Defendants' motion to dismiss, Plaintiff backs away from its assertion in the Complaint that Bailly has a duty to defend, instead characterizing Bailly's obligation as a duty to "reimburse costs" of defense. (Pl.'s Resp., at 10.) Plaintiff offers to file an amended complaint without the "duty to defend" language. (*Id.*) The court need not decide the issue of whether the Lease imposes upon Bailly a duty to reimburse TNT's defense costs,[5] because, as discussed above, the court finds that any claim for reimbursement is not ripe until the Board complaints are resolved. The indemnification claims in Counts I and II are therefore dismissed without prejudice to their assertion following resolution of the citizens' complaints pending before the Board. The construction breach claims as to the berm and the fence in Counts I and II remain viable.

## III. Count III: Contract Claims Against LFI

Defendants contend that Count III, a claim for breach of contract against LFI, must be dismissed because LFI is not a party to the Lease agreement. (Defs. Mem., at 10-11.) The court agrees. Plaintiff itself appears to recognize there is no basis for holding LFI accountable for a breach of the Lease, instead asserting that the contract at issue between TNT and LFI is the Sound Attenuation Proposal dated October 17, 2003. (Pl.'s Resp., at 21.) In that proposal, an unsigned one-page document on LFI letterhead, an unidentified person committed to "build[ing] a 30' high combination of earthen berm and noise reduction wooden fence . . . sufficient to reduce the sound levels [at the premises] to within Village of Monee Noise Ordinance Compliance at all times."

---

[5] Presumably, regardless of the language of an indemnity provision, the indemnitor will have an interest in participating in the indemnitee's defense. Indeed, the court presumes Defendants would have such an interest in this case.

11

(Sound Attenuation Proposal, Ex. B to Complaint.)  The document states, further, that the costs of the construction would require that TNT pay additional rent of $.10 per square foot.  (*Id.*)  Plaintiff alleges it has "performed all of its obligations under this contract," (Am. Compl. ¶ 52), but the only such obligation identified in the complaint is increased rent TNT paid Bailly Ridge for the property. (*Id.* ¶ 61.)  Indeed, although the Sound Attenuation Proposal identifies an increase in the rent to be paid for the property, that Proposal itself imposes no obligations on TNT; the increased rent is paid to the lessor pursuant to the Lease.  The only reasonable interpretation of the Sound Attenuation Proposal is that it is just that—a proposal made by LFI as the lessor's agent, setting forth conditions that the property to be leased would meet.  The court concludes that LFI has no contractual obligation to TNT pursuant to that Proposal.  Count III is dismissed.

## IV. Count IV: Negligence

As an alternative to TNT's breach of contract claim against LFI, Plaintiff brings a negligence claim against LFI in Count IV.  Plaintiff asserts that LFI in the Sound Attenuation Proposal "voluntarily assumed a duty" to build the berm and fence, and that LFI's failure to do so in accordance with the report issued by Shiner and Associates breached that duty.  (Am. Compl. ¶¶ 51-54.)  LFI responds that the voluntary undertaking doctrine applies only in cases of bodily injury or physical damage, and that under the *Moorman* doctrine, economic damages are not recoverable in tort.  (Defs. Mem., at 14.)  The court agrees that Plaintiff cannot maintain its negligence claim.

Pursuant to the voluntary undertaking doctrine as formulated by the Illinois Supreme Court, "one who undertakes, gratuitously or for consideration, to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking."  *Wakulich v. Mraz*, 203 Ill. 2d 223, 241, 785 N.E.2d 843, 854 (2003) (quoting *Rhodes v. Illinois Cent. Gulf R.R.*, 172 Ill. 2d 213, 239, 665 N.E.2d 1260, 1273 (1996)).  The typical application is where a defendant voluntarily comes to the aid of the plaintiff or undertakes to prevent harm, but in doing so actually increases the risk of harm.  *See, e.g., Wakulich*, 203 Ill. 2d at 241-42,

785 N.E.2d at 854-55 (finding voluntary assumption of duty when defendants sequestered a young woman who became unconscious after consuming a quart of an alcoholic beverage, rather than seek medical attention); *Cross v. Wells Fargo Alarm Servs.*, 82 Ill. 2d 313, 317-18, 412 N.E.2d 472, 474-75 (1980) (holding that where a housing authority voluntarily provided guard services, it assumed a duty "to use reasonable care not to create increased dangers to persons lawfully on its property."); *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 83, 199 N.E.2d 769, 778 (1964) (defendant who gratuitously undertook safety inspections on construction project assumed duty of due care and was liable for deaths and injuries in subsequent construction accident); *cf. Rhodes*, 172 Ill. 2d at 239, 665 N.E.2d at 1273 (finding no assumption of duty where a railroad merely called police to report an unconscious man on the floor of a car). Thus, the doctrine generally allows recovery only when the injury has been of a bodily or physical nature. *Weisblatt v. Chicago Bar Ass'n*, 292 Ill. App. 3d 48, 53, 684 N.E.2d 984, 987 (1st Dist. 1997).

Plaintiff, contending this rule is not absolute, cites *Stefan v. State Farm Mut. Auto. Ins. Co.*, 284 Ill. App. 3d 727, 672 N.E.2d 1329 (5th Dist. 1996) for the proposition that there is a "split of Illinois authority" that would allow recovery for purely economic loss under the voluntary undertaking doctrine. (Pl.'s Resp., at 24.) In *Stefan*, the plaintiff, who did not have underinsured motorist coverage, was struck by a car whose driver had low bodily injury limits on his coverage. 284 Ill. App. 3d at 729, 672 N.E.2d at 1331. The plaintiff brought a claim against his insurance agent, alleging that once the agent voluntarily initiated a State Farm check-up program that reviewed the adequacy of an insured's coverage, the agent assumed a duty to advise the plaintiff of his need for underinsured motorist coverage. 284 Ill. App. 3d at 773, 672 N.E.2d at 1334. The court's analysis of the voluntary undertaking doctrine consisted of a citation to *Nelson* and the statement that "[l]iability can attach from the negligent performance of a voluntary undertaking." *Id.* The court then held, with no discussion of the purely economic nature of the plaintiff's loss from the lack of extra insurance coverage, that the plaintiff had stated a claim for negligence under a voluntary

13

undertaking theory.  *Id.*

The court does not find *Stefan* persuasive.  To begin with, a single Illinois appellate court decision with no discussion of the issue does not signify a "split of authority" as to whether economic loss is recoverable under the voluntary undertaking doctrine.  The Illinois Supreme Court, in the decisions noted above, has addressed the doctrine solely in the context of a voluntary undertaking to prevent physical harm, or to aid someone who was injured.  In fact, these decisions expressly follow the Restatement (Second) of Torts, which defines the applicable undertaking as "necessary for the protection of a third person or his things" and finds liability only in the event of "physical harm."  RESTATEMENT (SECOND) OF TORTS § 324A (1965); *see, e.g., Wakulich*, 203 Ill. 2d at 242, 785 N.E.2d at 854 (quoting the Restatement); *Cross*, 82 Ill. 2d at 320, 412 N.E.2d at 476 (same); *see also LM ex rel. KM v. United States*, 344 F.3d 695, 701 (7th Cir. 2003) ("Illinois relies on §§ 323 and 324 of the Restatement (Second) of Torts to assess when a breach of a voluntary undertaking has occurred.").  Moreover, no court has followed *Stefan* in any published decision; indeed, two Illinois appellate courts have expressly disagreed with *Stefan* and reiterated the traditional bar to applying the doctrine outside the physical injury context.  *See Martin v. State Farm Mut. Auto. Ins. Co.,* 348 Ill. App. 3d 846, 854, 808 N.E.2d 47, 54 (1st Dist. 2004) (affirming dismissal of a voluntarily undertaking claim because an insurer's alleged breach of a duty to disclose coverage claims caused an alleged economic loss only, rather than bodily injury or property damage); *Weisblatt*, 292 Ill. App. 3d at 53, 684 N.E.2d at 987 ("It would appear that Illinois and many other jurisdictions would limit recovery under the voluntary undertaking doctrine to bodily injury or physical damage which is the context within which this doctrine developed.").

Finally, even if *Stefan* were persuasive law, it is distinguishable on the facts of this case.  The plaintiff in *Stefan* had an insurance policy with the defendant who then initiated the alleged undertaking of reviewing the policy for adequacy of coverage.  Here, TNT has no contract or agreement with Defendant LFI; as discussed above, the Sound Attenuation Proposal was not a

14

contract. Moreover, Plaintiff has not alleged that LFI was even the party that performed the alleged voluntary undertaking of building the berm and the fence. Rather, Plaintiff alleges that "Bailly Ridge TNT or its affiliate" built the fence. (Am. Compl. ¶ 47.) It is axiomatic that there must be some kind of "undertaking" on the part of the defendant for the voluntary undertaking doctrine to apply, and here, TNT has alleged none as to LFI.

Furthermore, Defendants are correct that Plaintiff's negligence claim is barred by the *Moorman* doctrine, which holds that purely economic loss is not generally recoverable in tort. *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 435 N.E.2d 443 (1982). Plaintiff does not, of course, allege any physical injury or property damage from the alleged deficiencies of the berm and fence. Rather, Plaintiff argues that an exception to *Moorman* applies in cases of fraud, and that here, the court cannot say that Defendants' failure to build an adequate berm and fence did not rise to the level of fraud. (Pl.'s Resp., at 24.) Plaintiff's argument is without merit. Although an exception to *Moorman* exists where a plaintiff's damages are proximately caused by a defendant's intentional, false representation, *see First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 337, 843 N.E.2d 327, 333 (2006), Plaintiff has alleged no set of facts consistent with a fraud claim. *See* FED. R. CIV. P. 9(b) (for fraud claims, "the circumstances constituting fraud . . . shall be stated with particularity.") Count IV is dismissed.

**V.    Count V: Promissory Estoppel**

As another alternative to its breach of contract claim against LFI, Plaintiff in Count V brings a claim for promissory estoppel, alleging that TNT relied to its detriment on LFI's "unambiguous promise" to build the berm and fence in accordance with the Shiner and Associates report. (Am. Compl. ¶ 51.) LFI argues that promissory estoppel cannot be pleaded as an independent cause of action in Illinois, and that in any event, Plaintiff has not stated a valid claim for promissory estoppel.

The court acknowledges some disagreement among Illinois courts as to whether Illinois

recognizes a cause of action for promissory estoppel. *Compare DeWitt v. Fleming*, 357 Ill. App. 3d 571, 573, 828 N.E.2d 756, 758 (5th Dist. 2005) (holding that promissory estoppel is available only as a defense in Illinois, and is not an independent claim for relief) *with Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*, 356 Ill. App. 3d 795, 801, 826 N.E.2d 970, 975 (1st Dist. 2005) (holding that the plaintiff sufficiently stated a cause of action for promissory estoppel). The Illinois Supreme Court has, however, in the past recognized promissory estoppel as an independent cause of action, *see Quake Constr., Inc. v. Am. Airlines, Inc.*, 141 Ill. 2d 281, 309-10, 565 N.E.2d 990, 1005 (1990), and has yet to hold otherwise. *See Ogdon v. Hoyt*, 409 F. Supp. 2d 982, 989 n.4 (N.D. Ill. 2006) (noting that *Quake Construction* remains good law). In the absence of further guidance from Illinois' highest court, this court assumes for purposes of this decision that a claim for promissory estoppel is still available in Illinois. *See Dumas v. Infinity Broad. Corp.*, 416 F.3d 671, 681 n.11 (7th Cir. 2005) (noting the uncertainty but declining "to speculate as to how the [Illinois] supreme court would deal with the issue," and considering plaintiff's promissory estoppel claim on its merits).

To state a claim for promissory estoppel in Illinois, a plaintiff must show: "(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Dumas*, 416 F.3d at 677 (quoting *Quake Constr.*, 141 Ill. 2d at 309-10, 565 N.E.2d at 1004). Promissory estoppel is not "designed to give a party . . . a second bite at the apple in the event that it fails to prove a breach of contract." *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869-70 (7th Cir. 1999) (quoting *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984)). Rather, it can succeed only in "narrow circumstances" where "all the other elements of a contract exist, but consideration is lacking." *Dumas*, 416 F.3d at 677 (citing *Bank of Marion v. Robert "Chick" Fritz, Inc.*, 57 Ill. 2d 120, 124, 311 N.E.2d 138, 140 (1974)); *All-Tech Telecom*, 174 F.3d at 869 ("Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law.").

16

Defendant LFI contends that promissory estoppel cannot apply in this case because there is no absence of consideration; rather, consideration was "provided for on the face" of the Sound Attenuation Proposal in the form of increased rent to be paid by TNT in exchange for the berm and fence. (Defs. Mem., at 13.) Plaintiff points out, however, that this consideration flows to Bailly, not LFI, and thus there is no consideration as to LFI that would preclude TNT's promissory estoppel claim. (Pl.'s Resp., at 23-24.) Plaintiff presents the court with a choice: either find that the increased rent constitutes consideration as to LFI, in which case the court should find a contract (and breach) between TNT and LFI, or find no consideration, in which case the court should allow TNT to assert a promissory estoppel claim against LFI. (*Id.*) The court disagrees with both options. Although Plaintiff is correct that no consideration exists as to Defendant LFI, this lack of consideration alone does not automatically satisfy the requirements of promissory estoppel. Rather, Plaintiff still must show that LFI made an unambiguous promise to TNT to build the berm and fence in accordance with the Shiner and Associates report—a promise that would be sufficient to constitute an enforceable agreement under contract law, but for the existence of bargained-for consideration. *See Dumas*, 416 F.3d at 677. As discussed above with respect to TNT's breach of contract claim against LFI, there is nothing in the Sound Attenuation Proposal to indicate an enforceable agreement.

Moreover, Plaintiff cannot demonstrate reliance on that promise. Plaintiff asserts that LFI negotiated the Lease on behalf of Bailly. (Am. Compl. ¶ 15.) The commitments made by the unidentified "I" in the Sound Attenuation Proposal were incorporated into the Construction Addendum to the Lease as contract conditions to be performed by Bailly. (*Id.* ¶ 22; Construction Addendum (14)(A)(3), Ex. A to Complaint.) Plaintiff, in effect, asserts that LFI made an unambiguous promise to build a berm and fence, and then argues that it relied on that promise by entering into a contract to have another party—Bailly—build that very same berm and fence. The promise and the reliance cannot be reconciled. As discussed above, the only reasonable

17

interpretation of the Sound Attenuation Proposal is that it was a statement of proposed terms, made in the course of negotiations between TNT and Bailly, through its agent LFI, that eventually found its way into the completed agreement between TNT and Bailly. As the Sound Attenuation Proposal cannot form the basis for a promissory estoppel claim, Count V is dismissed.

## **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss (15) is granted in part and denied in part. Plaintiff's claims in Counts I and II for indemnification are dismissed, but Plaintiff's claims arising from the alleged inadequacies of the berm and fence survive the motion. Counts III, IV, and V are dismissed. Plaintiff has leave to file an amended complaint consistent with this ruling within 14 days.

ENTER:

Dated: September 21, 2006

REBECCA R. PALLMEYER
United States District Judge